## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

ELIZABETH DIANE WEAVER,

                           CASE NO. 16-cv-10942

         *Plaintiff*,             DISTRICT JUDGE THOMAS L. LUDINGTON
*v.*                       MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

         *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 10, 11)

### I.       RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Weaver is not disabled. Accordingly, **IT IS RECOMMENDED** that Weaver's Motion for Summary Judgment, (Doc. 10), be **DENIED**, the Commissioner's Motion, (Doc. 11), be **GRANTED**, and that this case be **AFFIRMED**.

### II.      REPORT

#### A.       Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Elizabeth Diane Weaver's ("Weaver") claim for a period of disability,

1

Supplemental Security Income Benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.*, and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 10, 11).

On March 12, 2013, Weaver filed an application for DIB, alleging a disability onset date of July 21, 2011. (Tr. 164-70). Thereafter, on March 15, 2013, she filed an application for SSI, alleging the same disability onset date. (Tr. 171-76). The Commissioner denied both claims. (Tr. 80-115). Weaver then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on September 22, 2014, before ALJ Andrew G. Sloss. (Tr. 60-79). At the hearing, Weaver—represented by her attorney, David M. Stewart—testified, alongside Vocational Expert ("VE") Pauline A. McEachin. (*Id.*). The ALJ's written decision, issued November 24, 2014, found Weaver not disabled. (Tr. 20-35). On January 28, 2016, the Appeals Council denied review, (Tr. 1-4), and Weaver filed for judicial review of that final decision on March 16, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate

2

to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Weaver not disabled under the Act. (Tr. 43-55). At Step One, the ALJ found that Weaver had not engaged in substantial gainful activity from her alleged onset date of July 11, 2011, through her date last insured ("DLI") of June 30, 2015. (Tr. 45). At Step Two, the ALJ concluded that the following impairments qualified as severe: "generalized anxiety disorder and major depressive disorder . . . ." (Tr. 45-46). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 46-48). Thereafter, the ALJ found that Weaver had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations:

> [S]he can occasionally climb ramps or stairs and balance. Her psychological symptoms limit her to simple, routine tasks, in work that has only occasional changes in the work setting, and that involves only occasional interaction with the public, co-workers, and supervisors.

(Tr. 48). At Step Four, the ALJ found Weaver "unable to perform any past relevant work." (Tr. 53). Proceeding to Step Five, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 53-54).

### E.      Administrative Record

### 1.      Medical Evidence

The Court has reviewed Weaver's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 2.      Application Reports and Administrative Hearing

### i.      Function Report

On April 22, 2013, Weaver filled out a Function Report. (Tr. 222-29). In it, she indicated that she lived alone in an apartment, though her sister "stays with me a lot." (Tr. 222). Before the onset of her illnesses, she could "work, go out with friends, laugh, talk to people," and "go for walks." (Tr. 223). At the time of her writing, however, she could not sleep, and was "scared, nervous," and "worried." (*Id.*). Describing her illness, she said that she "[m]akes mistakes too much, can't stay focused . . . forgets, medicine makes me sleep or be very sluggish and unfunctionable [sic] to be drawing blood and giving injections, and handling cash and people[s'] personal information." (Tr. 222). On an average day, she would "just stay inside," "sleep [an] hour in daytime," or "go to appointments" because "I don't sleep and night" and "I be scared and nervous . . . ." (Tr. 223). She "can't sleep at night" because she was "always worried [something] bad" was "go[ing] [to] happen." (Tr. 228). She noted no issues with personal care other than that she "just put on what's quick"

6

when dressing. (Tr. 223). She also indicated that she needed no special reminders to take care of personal needs and grooming. (Tr. 224).

For meals, which she prepared three days a week, she ate simple food and "tr[ied] not to use [the] stove" because she "forgets to turn [it] off." (*Id.*). "I don't cook meals because I don't eat every day" and there was "no one to eat with." (*Id.*). With house and yard work, Weaver lamented that "all my cleaning don't get done, body hurt or to[o] tired," so she tried to "just [not] mess up to[o] much" for a "couple hours." (*Id.*). Weaver noted that she did not go outside unless "forced to" due to fear and apathy. (Tr. 225). She did not shop, and she refused to handle money because she kept "losing it and misplacing cards." (Tr. 225-26). Nevertheless, she could drive "if I must." (Tr. 225).

Where prompted, Weaver highlighted no hobbies or interests, and suggested that "when they force it," she would listen to "my sister, mom, and daughter [when] they talk . . . ." (Tr. 226). In general she "don't wanna [sic] be bothered" and "don't really like people around me." (Tr, 227). With respect to authority figures, Weaver wrote only: "hate people telling me what to do." (Tr. 228).

Providing information about her abilities, Weaver alleged problems with walking, talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 227). Specifically, she indicated an ability to pay attention for five minutes, an inability to finish what she starts, and a general inability to follow directions. (*Id.*). She also listed various side effects of her medication, including drowsiness, nausea, dizziness, and aloofness. (Tr. 229).

        **ii.**        **Weaver's Testimony at the Administrative Hearing**

At her hearing, Weaver began by answering several basic questions about her background. She graduated high school, held a driver's license, and acquired a licensed to practice as a medical assistant, "phlebotomist." (Tr. 63). She had not, however, worked anywhere since her alleged onset date of July 21, 2011. (Tr. 63-64). At present, she had no source of income. (Tr. 64). Though she took medication for her "right shoulder, neck," and "back pain," it kept her "drowsy," and because she had "to constantly take it," she felt constantly drowsy. (*Id.*). In addition, "I had surgery on both of my feet, so they just like constantly hurt and hard to stand up on, . . ." (*Id.*). The problems with her neck, shoulder, and back persisted for "about 7, 10 years," and the pain was "getting worser [sic]." (Tr. 65). Days before the hearing, she also "sprained my knee" by tearing some ligaments. (Tr. 66). With respect to physical problems, Weaver confirmed having issues crouching, kneeling, crawling, and reaching overhead. (Tr. 74-75).

Asked about her psychological symptoms, Weaver testified that "I hear things. I see things. I really don't – I prefer not to deal with a lot of people because it always end up in a confrontation and forgetful. My daughter don't let me use no electrical stuff, because I'll forget to cut the stove off. So I'm just like limited until she come back home." (Tr. 67). To treat these symptoms, she visited a counselor and took medication. (*Id.*). On a typical day, she denied cooking meals or doing housework because her shoulder and foot pain made physical labor trying, and touching "anything electrical that could be left on" was dangerous, as she might forget to turn it off. (*Id.*). "[M]ostly, I probably – once I take my medicine all day, then I'm just like stuck." (Tr. 68). She relayed being "[g]rouchy a lot,"

8

and suffering crying spells "[j]ust about every day, because I can't do nothing I used to do. It's bothering me." (*Id.*). She takes medication for these feelings as well, but "[i]t really do[esn't]" help. (*Id.*). Nor did she feel safe outside the house, because "[i]t's dangerous out there." (Tr. 69). Detailing this feeling, she recounted being robbed, and then on another occasion seeing a gunman "with the gun" in his hand. (*Id.*). In public, Weaver suffered from panic attacks. (Tr. 74).

Weaver then noted headaches that could last an entire day: "I just have to stay in the dark, just keep the blinds closed and I just try to stay laying down, my eyes closed. I try not to think, but that's hard." (Tr. 69-70). For her breathing problems, she used an "inhaler and a nebulizer, that machine that you pour that medicine in and you have to breathe it. And I have to do that like a couple of times, like maybe twice a week." (Tr. 70). "When it's warm and humid or too cold," she acknowledged not being able to breathe. (*Id.*). Physical exercise also exhausted her. (*Id.*).

Weaver said she did not have any close friends. (*Id.*). Thereafter, she identified a friend named Diana, who "just come around here and there." (Tr. 71).

She testified to sleeping thirty to forty-five minutes at a time in the evening, resulting in her falling asleep on and off during the day, "maybe three, four times." (Tr. 72). She also noted difficulties using her arm, though admitted she could do "a few things" for herself. (Tr. 73). Weaver's daughter did not allow her to drive anymore because the last time she did, "I fell asleep." (*Id.*).

### iii.    The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of the VE to determine Weaver's ability to work. (Tr. 76). The ALJ first identified Weaver's only relevant employment as "medical assistant," and proceeded to ask his first hypothetical—that is, what jobs might be available for a person "limited to light work, except that she could only occasionally climb, ramps or stairs and balance and her psychological symptoms would limit her to simple, routine tasks and work that has only occasional changes in the work setting and that involves only occasional interaction with the general public, co-workers and supervisors, . . ." (Tr. 76).

To this, the VE indicated that such an individual could work as "an inspector"—for which 180,000 national job availabilities existed—a "housekeeper"—for which 50,000 national job availabilities existed—and as "an assembler"—for which 125,000 national job availabilities existed. (Tr. 77). She noted that employers would permit "no more than one [absence] per month and no more than a total of eight absences in a 12-month period of time." (*Id.*). And lastly, she noted that an unskilled individual "off task for more than 20 percent" of the work day "could not work in a competitive work environment." (*Id.*).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who

10

are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

11

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting

objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

13

749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed

14

prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.       Analysis

In her brief, Weaver presents six arguments: (1) that the ALJ did not properly evaluate evidence of Weaver's physical impairments, and as a result that the RFC erroneously omitted any accommodations they might require; (2) that the RFC failed to account for Weaver's difficulties with concentration, persistence, or pace; (3) that the ALJ failed to include Weaver's physical impairments into questions posed to the VE; (4) that the ALJ should not have relied on the State Agency medical and psychological consultants' opinions because they did not review the entire medical record; (5) that the ALJ failed to give good reasons for discounting the opinion of Dr. Magoon, Weaver's treating psychiatrist; and (6) that the ALJ did not "build a logical bridge between [Weaver's] testimony about her activities of daily living, the medical records and his residual functional capacity determination." (Doc. 10 at ID 718-23). I evaluate each in turn.

### 1.       The ALJ's Findings as to Weaver's Physical Impairments

Weaver asserts generally that "she has multiple exertional impairments that limit her [RFC] beyond the [ALJ's] assessment." (Doc. 10 at ID 718). In particular, she asserts that the ALJ's decision bore this error out in two ways: (i) the ALJ gave too much weight to the consultative examination Dr. Geoghegan performed, as he only examined her once and did not review "Exhibits 7F through 19F," (Doc. 10 at ID 718-19); and (ii) the ALJ failed to recognize Weaver's alleged physical impairments—specifically "chronic

asthma," "fatigue," "shortness of breath," "neck, back and right shoulder impairments"—as "severe impairments" with "more than a minimal affect [sic] on her [RFC]," (Doc. 10 at ID 719).

### i.        Reliance on Dr. Geoghegan

An ALJ makes no error in assigning great weight to a consultative examiner if that examiner's opinion proves supportable, consistent with the record evidence, and within the scope of her knowledge or specialization. *Accord, e.g.*, *Steagall v. Comm'r of Soc. Sec.*, 596 F. App'x 377, 380 (6th Cir. 2015) ("The ALJ must determine what weight to give the opinion of a non-treating physician by [evaluating] . . . the opinion's supportability and consistency, and the physician's specialization.").

In reviewing the evidence, the ALJ assigned great weight to Dr. Geoghegan because his findings were "consistent with the record." (Tr. 52). These findings included Weaver's "ability to ambulate, climb stairs, or be in a seated or standing position for long periods," use her "upper extremities for lifting, pulling, pushing, or carrying," and use her "fingers in both hands for fine manipulation tasks." (*Id.*). Although the ALJ did not cite the record at this point, "[t]he Sixth Circuit has noted that courts are not constrained to reviewing solely the ALJ's step three analysis in considering whether the ALJ's findings are supported by substantial evidence, . . ." *Vock v. Comm'r of Soc. Sec.*, No. 13-12753, 2014 WL 4206885, at *6 (E.D. Mich. Aug. 22, 2014). Earlier in his opinion, the ALJ extensively discussed Weaver's alleged physical impairments and found that the record failed to substantiate them. (Tr. 50-51). He cited, as I explain below, substantial evidence to validate his conclusions. Moreover, his analysis leaves little doubt that he took notice of the

requisite factors in evaluating Dr. Geoghegan's reliability. For this reason, the ALJ did not err in assigning great weight to Dr. Geoghegan's opinion.

### ii.   Declining To Recognize Weaver's Physical Impairments as "Severe"

The severity requirement—codified at 20 C.F.R. §§ 404.1520 and 404.1521—remains a "*de minimis* hurdle in the disability determination process," useful in discarding claims "obviously lacking in medical merit." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). In accordance with these regulations, however, an ALJ must "continue with the remaining steps" in the disability determination when she determines that some impairments qualify as severe, and others nonsevere. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). For this reason, the "fact that some of [a claimant's] impairments were not deemed to be severe at step two is . . . legally irrelevant" if the ALJ considers both "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony v. Astsrue*, 266 F. App'x 451, 457 (6th Cir. 2008).

The ALJ in this case plainly considered the impact Weaver's nonsevere physical impairments would have on her capacity to work. Although my analysis as to this objection could end here, I note also that substantial evidence happens to support the ALJ's findings as to these impairments:

As the ALJ recognized, Weaver's "history for asthma was 'mild' and adequately managed with medication . . . ." (Tr. 50); *see, e.g.*, (Tr. 269) ("History of Mild Persistent Asthma."); (Tr. 319) (same); (Tr. 272) (indicating that asthma was "[w]ell controlled"); (Tr. 294) (listing conservative treatment for asthma). Imaging of Weaver's elbows

17

disclosed no abnormalities. (Tr. 50); *see, e.g.*, (Tr. 297) ("No acute fracture or dislocation identified. No joint effusion. Bone mineralization is normal."); *see also* (Tr. 300) (noting a "normal" inspection of Weaver's elbow). Bilateral foot conditions failed to register as severe. (Tr. 50); *see, e.g.*, (Tr. 326) ("The patient had no difficulty getting on and off the examination table, no difficulty heel and toe walking, no difficulty squatting, and no difficulty hopping."). Motor strength appeared overwhelmingly normal throughout the record. (Tr. 50); *see, e.g.*(Tr. 326) ("Grip strength is intact bilaterally as tested grossly. There was full fist bilaterally. The hands have full dexterity."). The record contains no objective evidence of Weaver's back pain. (Tr. 50); *see, e.g.*, (Tr. 655) ("no deformity or scoliosis noted of thoracic or lumbar spine."). Not only did Weaver's neck and shoulder pain fail to surface in her spinal imaging, but her complaints of pain occurred sporadically, and treatment appeared to ease any symptoms she might have had. (Tr. 50); *see, e.g.*, (Tr. 472) (noting that therapy "significantly decreased [Weaver's] right arm symptoms and neck pain"); (Tr. 476) (denying neck pain); (Tr. 499) (finding "good" range of motion in neck); (Tr. 511) (finding "normal alignment and mobility" in Weaver's extremities). Though evidence of "mild effusion" of her right shoulder surfaces in the record, treatment with cortisone injections seemed to yield positive results. *E.g.* (Tr. 603-04) ("After ten minutes of observation the patient noticed that the majority of his/her pain and symptoms were relieved."). And there remains no indication that Weaver's knee injury "was expected to last 12 months in duration," and therefore that the RFC needed to accommodate it. (Tr. 50); *see* (Tr. 612) ("You have a knee sprain, which is a tearing of the ligaments that hold the joint together. There are no broken bones. Sprains take from 3 to 6 weeks to heal.").

18

Significantly, the ALJ cited substantial evidence in support of these findings. (Tr. 50-51). He also incorporated nonexertional postural limitations into the RFC to the extent the record supported a need for them, including "occasional climbing of ramps or stairs and balancing." (Tr. 51). To the extent, therefore, that Weaver's claim of error on this count targets the ALJ's RFC assessment, rather than his Step Two "severity" determinations, her claim should fail.

### 2.   The ALJ's Alleged Failure To Incorporate Weaver's Difficulties with Concentration, Persistence, or Pace into the RFC

Gesturing toward the VE's statement that an individual "off task for 20% of the time" could not obtain competitive employment, Weaver posits that the ALJ failed to adequately account for her "moderate difficulties with regard to concentration, persistence, or pace" because he "did not account for the time [she] would be off task during a normal workday." (Doc. 10 at ID 722). Because he "did not even include the need to restrict [Weaver] from fast-paced, production type work," the ALJ committed error. (*Id.*). Through this argument, Weaver strongly implies that the ALJ was obligated to find that she would be off task more than 20% of any normal work day.

In his opinion, the ALJ evaluated evidence suggesting moderate difficulties with concentration, persistence or pace. He noted that Weaver could focus well enough to drive, watch television, complete crossword puzzles, and use a computer, but not well enough to manage personal finances. (Tr. 47). Thereafter, he determined a limitation to "simple, routine tasks, in work that has only occasional changes in the work setting, and that involves only occasional interaction with the public, co-workers, and supervisors" would

19

account for these difficulties. Where a claimant's "full impairments" limit the "speed at which [she] could work," however, a limitation "to simple work" alone "might be insufficient to account for moderate deficiencies in concentration, persistence or pace." *Gordon v. Comm'r of Soc. Sec.*, No. 14-11990, 2015 WL 5335477, at *5 (E.D. Mich. Aug. 12, 2015). In *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010), for instance, the Sixth Circuit remanded a case because the ALJ's RFC failed to account for a "description of [the claimant's] abilities speak[ing] to some of the restrictions—in pace, speed, and concentration—that both [the state agency consultant] and the ALJ found [him] to have." In addition, "[c]ourts have found '[i]t is difficult to reasonably accept 'moderate' [concentration deficits] meaning anything less than [drifting off-task] 20%-30% of the time at work." *Borgman v. Comm'r of Soc. Sec.*, 2012 WL 3542501, at *12 (E.D. Mich. July 9, 2012) (quoting *Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009)) (internal quotation marks omitted).

In support of his RFC determination, the ALJ questioned the severity of Weaver's concentration difficulties in particular, citing a record showing normal "mood, affect, attention span, and concentration . . . despite her complaints." (Tr. 49); (Tr. 314). And the Commissioner points out that the ALJ's mental RFC comports significantly with Dr. Dickson's impressions that Weaver's "abilities to understand, attend to, remember, and carry out instructions related to work-related behaviors are mildly impaired" while her "abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are moderately impaired." (Tr. 322). Limitation to simple,

routine tasks, and occasional interaction with others follows from these recommendations and other substantial record evidence.

Importantly, the only medical opinion documenting extreme or marked restrictions in this department comes from Dr. Magoon, whom the ALJ rationally discredits.[1] (Tr. 52-53); (Tr. 624-26). Unlike *Ealy*, in which a consultant (with whom the ALJ agreed) placed "concrete functional limitations" on the claimant's "abilities to maintain attention, concentration, or pace when performing simple, repetitive, or routine tasks," the ALJ in this case does not flout medical assessments consistent with his view of the substantial evidence. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014). Indeed, he thoroughly discussed the medical evidence at issue, including Weaver's testimony, GAF scores, and daily activities, and came to a reasoned conclusion about her capacity to work, citing the record every step of the way. (Tr. 49-50). As such, his mental RFC is supported by substantial evidence.

### 3.      The ALJ's Questions to the VE

Weaver further contends that the ALJ's "failure to include" her physical impairments "in the hypothetical questions posed to the vocational expert[] results in a lack of foundation for the vocational expert's testimony." (Doc. 10 at ID 720).

An ALJ fails to fulfill her burden at Step Five of her analysis if she "improperly discredit[s]" evidence in a claimant's favor and, in doing so, fails to "formulate hypothetical questions that comprehensively capture[] all the factors relevant to the VE's

---

[1] I reserve discussion of the ALJ's treatment of Dr. Magoon for a later section, and mention it here merely as further support for my conclusion that substantial evidence bolsters the ALJ's RFC assessment.

21

determination of whether gainful work exists that [the claimant] can do." *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 438 (6th Cir. 2013); *cf. Banks v. Colvin*, No. 13-CV-14477, 2014 WL 7204967, at *4 (E.D. Mich. Dec. 17, 2014) ("VE testimony is probative only to the extent it is given in response to hypothetical questions which accurately portray plaintiff."). Nevertheless, "[i]n a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record . . . ." *Elliot v. Comm'r of Soc. Sec.*, No. 14-10870, 2015 WL 904990, at *10 (E.D. Mich. Mar. 3, 2015).

As discussed above, the ALJ did not improperly discredit evidence of Weaver's impairments. His question to the VE mirrored his RFC assessment. Because substantial evidence bolstered his RFC assessment, it follows *a fortiori* that substantial evidence also supported his question to the VE.

### 4.    The ALJ's Reliance on the State Agency Medical and Psychological Consultants

Weaver takes issue with the ALJ giving "an undisclosed amount of weight to the opinions of the State Agency [consultants], indicating, incorrectly, that 'they had the opportunity to review the entire record.'" (Doc. 10 at ID 722). "While a non-examiner's review of a complete case record is an *example* of an appropriate circumstance in which to afford a non-examiner's opinion more weight than an examiner's opinion, . . . there is no requirement that a non-examiner's opinion be based on a review of the entire case record in order to support an ALJ's decision denying benefits." *Kikolski v. Comm'r of Soc. Sec.*, No. 14-cv-14700, 2016 WL 6080217, at *9 (E.D. Mich. Jan. 27, 2016); *see, e.g., Norris v.*

*Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) ("Although . . . the opinions of nontreating sources are generally accorded more weight than nonexamining sources, it is not a *per se* error of law, . . . for the ALJ to credit a nonexamining source over a nontreating source. . . . [A] claimant is entitled under the SSA only to reasons explaining the weight assigned to his treating sources, independent of the success of his disability benefits claim.").

Where, as here, the ALJ "thoroughly considered and discussed those records and opinions dated after [the state agency consultants] gave [their] opinion[s]," he does not err in relying on those opinions. *Schaub v. Comm'r of Soc. Sec.*, No. 1:16-CV-80, 2016 WL 6122602, at *5 (W.D. Mich. Oct. 20, 2016) (upholding the ALJ's assignment of "great weight" to a state agency consultant); *accord Cady v. Comm'r of Soc. Sec.*, No. 1:14-cv-57, 2015 WL 3767666, at *6 (W.D. Mich. June 17, 2015) ("Given the delay inherent in the administrative review process, few, if any cases, will present a static medical record from a date before the decision on initial review through the date of the ALJ's decision. It is patent that the ALJ understood that Dr. VanderHaagen gave his opinion on the basis of the medical record as it existed in December 2010."). That the ALJ did not explicitly specify what weight he gave these consultants' opinions—and perhaps mistakenly[2] suggested that "they had the opportunity to review the entire record," (Tr. 53)—is of no moment. Even assuming such aspects of his decision were error, such error worked no harm on Weaver. The ALJ's opinion makes clear that he considered the consistency of the state agency

---

[2] Taken literally, the ALJ's statement is incorrect. The ALJ likely meant to indicate, however, that the state agency consultants reviewed the entire record as it existed when they reviewed the record.

consultants' opinions with the entire record, as well as the remainder of the medical record excluded from their review. For this reason, the ALJ's reliance on the state agency consultants should provide no grounds for remand.

> **5.      The ALJ's Election To Accord Little Weight to Dr. Magoon's Opinion**

Weaver posits briefly that the ALJ "failed to give adequate reasons for giving little weight to" Dr. Magoon's opinion, and invites the Court to "look at the[] pages" cited by the ALJ, "and the entirety of R. 7-9, Tr. 562, as she is convinced" the Court "will not find that these records form an adequate basis for discounting Dr. Magoon's opinions." (Doc. 10 at ID 720). Thereafter, Weaver seems to list evidence consistent with Dr. Magoon's findings to the end of undermining the ALJ's finding that Dr. Magoon's opinion was inconsistent with the medical evidence of record.

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 404.1527(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). In weighing a treating source statement, the ALJ considers the length of the treatment relationship and frequency of examination, as well as the nature and extent of the treatment relationship. *Id.* § (c)(2)(i)-(ii). Where a treating source's opinion proves "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it "controlling weight." *Id.* § (c)(2). In any case, the Commissioner "will always give good reasons. . . for the weight [given to a] treating source's opinion." *Id.*

In discounting Dr. Magoon's opinion, the ALJ reasoned that "his findings are not consistent with the substantial evidence of record and the specific findings from his therapist . . . ." (Tr. 52). He also supposed that "Dr. Magoon based his findings on [Weaver's] subjective complaints . . . ." (Tr. 52-53). Indeed, Dr. Magoon appeared to rely, at least in part, on Weaver's statements about her daily activities, which conflicted with her record testimony as to her personal activities, social comfort, and her receptiveness to medication. *Compare* (Tr. 625) (suggesting that Weaver's mental impairments affect "[c]ooking," "[m]edication," "[t]ransportation," and [w]ork"), *with* (Tr. 539) ("Therapist has seen client while on medication and she is a completely different person. She is intelligent, reasonable, and kind."); (Tr. 554) ("Client reported her sister, mother and herself will be going to a water park for their Thanksgiving holiday."); (Tr. 557) ("Client stated 'I am going on vacation with relatives for two weeks soon' 'We are going to Texas where it is warm.'"); (Tr. 223) (listing no difficulty with personal care). And as discussed above, substantial evidence reinforces the ALJ's mental RFC findings. Because the ALJ furnished good reasons for discrediting Dr. Magoon's opinion, and because his findings are supported by substantial evidence, the ALJ committed no error in according Dr. Magoon little weight.

### 6.       The ALJ's Alleged Failure to Build a Logical Bridge Between the Record Evidence and his RFC

Citing the ALJ's concluding paragraph to the RFC, Weaver suggests that the ALJ's language "is, at best, confusing, and fails to adequately form the 'logical bridge' required to support his [RFC]." (Doc. 10 at ID 723). "[T]he court may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result." *Pollaccia v. Comm'r of Soc. Sec.*, 2011 WL 281044, at *6 (E.D. Mich. Jan. 6, 2011) (quoting *Ramos v. Astrue*, 674 F.Supp.2d 1076, 1080 (E.D. Wisc. 2009)) (internal quotation marks omitted). A "cursory" or irrelevant analysis, for instance, fails to provide a logical bridge between the evidence and the conclusion. *Samona v. Comm'r v. Soc. Sec.*, No. 2:15-cv-11713, 2016 WL 3951420, at *7 (E.D. Mich. June 24, 2016).

In stating this objection, Weaver simply restates previous objections to the ALJ's RFC. But as discussed above, the ALJ's analysis parses the record material in a way neither cursory nor irrelevant. It clearly provides a logical bridge between the record evidence and the RFC. *Accord Mitchell v. Comm'r of Soc. Sec.*, 2014 WL 840086, at * 16 (E.D. Mich. Mar. 4, 2014) ("[T]he ALJ did include a logical bridge from the summary of medical evidence (which was extensive . . .) and consideration of all the medical opinions in the record."). For this reason, this Court should reject Weaver's contention on this count.

### H.       Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Weaver's Motion for Summary Judgment, (Doc. 10), be **DENIED**, the Commissioner's Motion, (Doc. 11), be **GRANTED**, and that this case be **AFFIRMED**.

### III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue

raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date:  January 20, 2017                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 20, 2017                     By s/Kristen Castaneda
                                           Case Manager