UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ELIZABETH DIANE WEAVER,

                Plaintiff,              Case No. 16-cv-10942

v                                     Honorable Thomas L. Ludington
                                     Magistrate Judge Patricia T. Morris

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____/

**ORDER OVERRULING PLAINTIFF'S OBJECTIONS, ADOPTING THE REPORT
AND RECOMMENDATION, DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
AND AFFIRMING THE DECISION OF THE COMMISSIONER**

On January 20, 2017 Magistrate Judge Patricia T. Morris authored a Report and
Recommendation addressing Plaintiff Elizabeth Diane Weaver's motion for summary judgment
and Defendant commissioner of social security's motion for summary judgment. ECF Nos. 10,
11. In the report and recommendation, Judge Morris recommends denying Plaintiff's motion for
summary judgment and granting Defendant's motion for summary judgment. ECF No. 12. On
February 2, 2017 Plaintiff timely filed objections. ECF No. 13.

Pursuant to a de novo review of the record, Plaintiff Weaver's objections will be
overruled and the report and recommendation will be adopted. Plaintiff's motion for summary
judgment will be denied, Defendant's motion for summary judgment will be granted, and
Plaintiff's claims will be dismissed with prejudice.

**I.**

Because the magistrate judge's report did not include a general summary of the facts, a
summary is provided here. Plaintiff Elizabeth Weaver was born on April 5, 1970, and resides in

Flint, Michigan.   *See* Pg. ID 86. She has a driver's license, but can no longer drive due to medication.  *Id*.  Plaintiff graduated from high school, and is a certified medical assistant in phlebotomy.  *Id*.  Plaintiff previously worked as a cashier from February of 1985 to November of 2008. *See* Pg. ID 116.  She began working as a medical assistant in December of 2003, but was terminated in March of 2011.  *Id*.  She was unable to obtain substitute employment following her termination, and alleges that she became disabled on July 21, 2011. *See* Pg. ID. 87, 190, 197.

### A.

Plaintiff suffers from a variety of ailments.   She regularly treated with Doctor Gary Roome, M.D. at the Burton Medical Clinic in Saginaw, Michigan. *See* Pg. ID. 317. Plaintiff also repeatedly visited the Taylor Psychological Clinic for complaints of depression and anxiety. *See* Pg. ID 304-14.   From 2012 to 2013, Plaintiff also regularly visited the Genesys Regional Medical Clinic in Burton, Michigan, for issues ranging from hypothyroidism, depression, asthma, bug bites, and vaginal discharge. *See* Pg. ID 291-303.

On May 5, 2012 Plaintiff visited Dr. Roome at the Burton Clinic after allegedly dropping a chair on her right shoulder. Pg ID. 322.  Plaintiff reported a sharp, intermittent pain in her right shoulder.  *Id*.  An examination of her right elbow conducted at the McLaren Regional Medical Center on May 14, 2012 identified no acute fracture, dislocation, or joint effusion.  *See* Pg. ID 325. Two days later, on May 16, 2012 Plaintiff visited the Burton Medical Clinic and reported a variety of issues including ear issues and chronic soreness in her right arm and chest.  Pg. ID. 327. Plaintiff also reported that she had injured her right side on May 13, 2012 when she was "horsing around' with a friend.  *Id*.  Plaintiff therefore requested refills of medication and an increase to her Xanax prescription. *Id*.  An inspection of her shoulder and elbow revealed that Plaintiff was not in acute distress. *Id*.

- 2 -

Plaintiff returned to the Burton clinic on May 31, 2012 and reported that she was no longer in any pain. *See* Pg. ID 331. While Plaintiff reported a cough and sore throat, Dr. Hamaker noted that Plaintiff used marijuana, and suggested that she cease smoking. Pg. ID 331-33. In a visit on July 13, 2012 Plaintiff reported that she had chronic pain in her feet, but left without being seen by Dr. Roome. *See* Pg. ID 337-38.

During an appointment at the Taylor Clinic on November 6, 2012, Plaintiff reported a number of traumatic events in her past, and noted that she did not like people. *See* Pg. ID 309. The treating therapist noted that Plaintiff spent her free time watching television, using the computer, and completing cross word puzzles. *See* Pg. ID 310. He found her to be alert and cooperative, with appropriate appearance and a normal stream of thought. *See* Pg. ID 311. He noted that Plaintiff had an anxious reaction and reported some auditory hallucinations. *Id*. Plaintiff was diagnosed with general anxiety. Pg. ID 312. On December 2, 2012 Plaintiff visited the Genesys Clinic and saw Doctor Madonna Hanna, M.D, regarding her depression. Doctor Hanna noted that Plaintiff had normal orientation to person, place and time, but discussed a variety of problems, jumping from one issue to another. Pg. ID 292. Doctor Hamma directed Plaintiff to continue taking her medication and to take vitamin D, and directed her to follow up with a psychologist. *Id*.

On March 14, 2013 Plaintiff visited the Genesys Regional Medical Clinic for her asthma. *See* Pg. ID 300. Dr. Hamma found that Plaintiff's asthma was triggered by cold weather and upper respiratory tract infection. *Id*. She noted Plaintiff's symptoms of stable coughing and shortness of breath during exertion, but noted that Plaintiff did not report any chest tightness. *Id*. A physical examination of Plaintiff did not reveal any signs of respiratory distress, wheezing, or labored breathing. *See* Pg. ID 301. Overall, Dr. Hamma assed Plaintiff as having mild persistent

asthma, and found that Plaintiff's asthma was well controlled by her medication. *See* Pg. ID 272-73.

On April 17, 2013 Plaintiff underwent a mental status examination at the Taylor Clinic, which revealed that Plaintiff was attired appropriately with unremarkable expression and posture. *See* Pg. ID 307.   Plaintiff was found to be alert, with normal memory, orientation, thought progression, language, and perception.   *Id.*   She was found to have good insight and judgment. *Id.*   On April 26, 2013 Plaintiff visited Dr. Roome at the Burton Clinic complaining of fatigue, but denying insomnia, impaired concentration, or suicidal ideation. *See* Pg. ID 341.   She was reported to be alert and cooperative, with a normal mood and attention span, and she denied experiencing any chronic pain. *See* Pg. ID 340-42.

For nodular thyroid issues, Plaintiff made bi-annual visits to Endocrinologist Hemant T. Thawani, M.D.   Dr. Thawani's reports indicate that thyroid biopsies returned benign and that Plaintiff did not have positive thyroid autoantibodies. *See* Pg. ID 284-88.   She was prescribed medication to alleviate her symptoms. *Id.*   Plaintiff was repeatedly encouraged to remain adherent to her treatment regime, pg. ID 287-88, and Plaintiff acknowledged to various providers that she did not take her medication regularly.   *See*, e.g., Pg. ID 291.

**B.**

Plaintiff filed an application for Social Security Disability ("SSD") and Supplemental Security Income ("SSI") on March 11, 2013.   Plaintiff alleges severe impairments arising out of major depressive disorder, generalized anxiety disorder, bipolar disorder, hyperthyroidism, chronic asthma, bilateral foot pain, impairments of the neck, back, shoulder and arm, decreased grip strength, decreased range of motion, and a sleep disorder.   *See* Pg. ID 274-75.

**i.**

- 4 -

After Plaintiff filed her application, on July 8, 2013 Psychologist Mathew P. Dickson prepared a psychological report after visiting with Plaintiff.  Plaintiff reported that while she did not have contact with friends, she did have contact with family members.  Pg. ID 348.  She reported that she liked to stay at home, but was capable of basic household chores, such as basic cooking, self-care, hygiene, and occasional visits to the store. *Id*. Doctor Dickson noted that Plaintiff was well groomed, neatly dressed, and with spontaneous and organized stream of thought. *Id.*  While she reported that she sometimes hallucinated while on medication, Doctor Dickson did not find these descriptions conclusive of a psychotic disorder.  Pg. ID 349.  Doctor Dickson concluded that Plaintiff's "mental abilities to understand, attend to, remember, and carry out instructions related to work-related behaviors are mildly impaired."  *See* Pg. ID 350.  He further found that her abilities "to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are moderately impaired." *Id*.   He determined that her GAF score was 55.

**ii**

On July 17, 2013 Doctor Michael Geoghegan, D.O., conducted a consultative physical examination of Plaintiff. Pg. ID 353.  Dr. Geoghegan noted that, while Plaintiff alleged that she had been asthmatic for around a decade, she had not required any emergency room visits or hospitalizations in the past 12 months.  He reported that she suffered from a chronic dry cough, that environmental allergens exacerbated her breathing problems, and that her symptoms worsened during summer, but that she managed her symptoms with Ventolin. In conducting his physical examination, Dr. Geoghegan determined that Plaintiff's lungs were clear, and that her claims of shortness of breath were not substantiated by the physical examination. *Id*.   He

concluded that she should continue to use her medication and follow up with her primary doctor on a regular basis. *See* Pg. ID 357.

Dr. Geoghegan further noted that Plaintiff suffered from hypothyroidism, for which she took Synthroid 75 mg daily. *See* Pg. ID 353. He reported that thyroid biopsies returned benign, and concluded that she should continue to follow up with her doctor and have semiannual thyroid function tests. *See* Pg. ID 357.

With regard to Plaintiff's claims of physical pain, Dr. Geoghegan determined that Plaintiff's gate was normal, her range of motion for all joints checked in full, her straight leg raising test was negative, her grip strength was intact, and there was full fist bilaterally. Plaintiff was able to "pick up a coin, button a button, and open a door with both hands. The patient had no difficulty getting on and off the examination table, no difficulty heel and toe walking, no difficulty squatting, and no difficulty hopping." Pg. ID 354. He concluded that Plaintiff was able "to use her upper extremities for lifting, pulling, pushing, or carrying. No restrictions were noted with regard to her grip strength in either hand." *Id*.

### C.

Plaintiff's initial applications were denied on August 6, 2013. Along with the denial, Plaintiff was provided with disability determination explanations that included findings by state agency consultants Lenoard C. Balunas, Ph.D., B.D. Choi, M.D., and Nancy Sarti. After the initial denial Plaintiff submitted a series of supplemental medical records. *See* Pg. ID 104.

### i.

Plaintiff's supplemental physical treatment records mostly related to her claims of right shoulder and arm pain. *See* Pg. ID 485. On July 18, 2013 Plaintiff visited the Burton Medical Clinic and complained of level 10, sharp, constant stomach pain that had lasted for two weeks.

- 6 -

*See* Pg. ID 538. Plaintiff was prescribed Zantac. *See* Pg. ID 540.  Plaintiff again visited the clinic on August 3, 2013 and reported that she was not in any pain.  *See* Pg. ID 534.  On August 29, 2013 Plaintiff visited the clinic and complained of sharp, constant, Level 10 pain all over her body. *See* Pg. ID 530. She then informed Dr. Roone that she had anxiety, insomnia, and fatigue. Dr. Roone prescribed her Hydroxyzine Pamoate. *See*   Pg. ID 533. Plaintiff then visited the emergency room on September 3, 2013 for neck pain. *See* Pg. ID 542. An exam revealed prevertebral soft tissue, epiglottis, and aryepiglottic folds within normal limits, with minor degenerative changes noted. *Id.*  On September 5, 2013, Plaintiff visited the Burton Medical Clinic and complained of lower back pain, but reported that she did not experience any chronic pain.  *See* Pg. ID 526. Dr. Roome prescribed Plaintiff Indomethacin and Tramadol. *See* Pg. ID 529.

During a visit to the Urban Health and Wellness Center on October 10, 2013, Plaintiff stated that she had experienced intermittent neck and right arm pain for around four years, and that the symptoms were getting worse. *See* Pg. ID 498. The treating physician determined that Plaintiff had impaired muscle endurance, muscle strength, posture, joint mobility, and range of motion.  *See* Pg. ID 500-01. He noted that these issues were associated "with connective tissue dysfunction," but determined that the prognosis was good.  He also determined that Plaintiff had positive spurlings, slump bilaterally, and decreased right grip strength. Plaintiff was directed to attend physical therapy. *See* Pg. ID 501. By late 2013 Plaintiff reported that her neck was improving, and that she hoped to improve her neck strength. *See* Pg. ID 488-92.

During visits to the Burton Clinic on September 25, 2013 and December 3, 2013 Plaintiff reported that she did not have any pain and did not experience any chronic pain. *See* Pg. ID 521, 517.  During a February 19, 2014 visit to Dr. Roome, Plaintiff complained of Level 10 pain in

- 7 -

her right neck and shoulder at the time of her check in. *See* Pg. ID 511.  However, at the time of her physical exam she complained of back pain and neck pain. *See* Pg. ID 512-13.  In a May 1, 2014 visit to Dr. Roome, Plaintiff reported level 10 right foot pain during check in, but later complained of right shoulder pain to Dr. Roome. *See* Pg. ID 508-09.  While Dr. Roone cautioned her that absent an acute medical problem she was required to schedule an appointment, Dr. Roone prescribed her Prednisone.  In a June 9, 2014 visit to Dr. Roome, Plaintiff reported to a level 10 pain in her right arm. *See* Pg. ID 503.

Plaintiff visited OrthoMichigan on July 22, 2014 and received an x-ray of her right shoulder. Pg. ID 637.  The x-ray revealed no acute fracture[,] dislocation[,] or other osseous abnormality. *Id.* Plaintiff apparently received an emergency call while waiting to be seen, and so was not seen by a healthcare provider. *Id.*

Plaintiff again visited OrthoMichigan on July 24, 2014 and reported that she had experienced a dull, chronic pain in her shoulder for eight to ten years, but that the pain had increased over the past two years.  Pg. ID 635. An exam of the shoulder by  Physician's Assistant Wade B. Wines, under the supervision of Doctor Seann E. Wilson, M.D., revealed "no cutaneous manifestation of disease", "forward flexion to 170 degrees, external rotation at the side to 80 degrees and internal rotation to above the beltline."  Plaintiff reported pain related to an impingement test.  She had full range of motion in her elbow.

A review of Plaintiff's prior x-rays revealed some cystic degenerative change within the greater tuberosity with some sclerosis on the under surface of the acromion.  Furthermore the "Shenton's line of the shoulder appears to be slightly broken but the humorous is not grossly high riding."   The X-ray also revealed minimal arthritic wear, a possible lesion, and a humerus impingement on the supraspinatus outlet. *See* Pg. Id 635-36.   P.A. Wade stated that "we

- 8 -

recommended against the injection and recommended some physical therapy for rotator cuff flexibility and strengthening and follow up in about four weeks for the injection i[f] she is still having pain."

Despite this plan, Plaintiff returned to receive an injection on July 30, 2014. Pg. ID 633. Physician's Assistant Wines documented that Plaintiff's symptoms had previously improved with physical therapy and a cortisone injection, but that the symptoms had returned over the last several months. Pg. ID 633. PA Wines again assessed Plaintiff as having a right shoulder impingement, and performed the cortisone injection. Following the injection, "[a]fter ten minutes of observation the patient noticed that the majority of [her] pain and symptoms were relieved." *See* Pg. ID 634.

**ii.**

Plaintiff also submitted updated psychological records. Plaintiff apparently began treating with professionals at Genesee Health System, later Hope Network, in June of 2013. During her initial assessment, Licensed Social Worker Matthew Marx noted that Plaintiff presented with "an extensive history of trauma … and struggle[ed] with symptoms of depression, anxiety, sleep disturbance, nightmares, intrusive and obsessive thoughts and flashbacks of previous traumatic experiences." Pg. ID 629.  He noted that Plaintiff was afraid to leave her home.  *Id*.  He found her stream of thought to be intact and lucid, her affect blunted, her reality oriented, and no delusional or hallucinatory ideations. *Id*.  It was noted that Plaintiff had a good relationship with a sister who lived in Michigan, and that she had a good relationship with her 18 year old daughter. *See* Pg. ID 615.

Plaintiff attended a follow up visit on July 8, 2013.  *See* Pg. ID 608. At that time, while she continued to experience problems with anxiety and depression, her thoughts were coherent

and lucid, she was oriented to reality, and was not experiencing psychosis. *Id*. Again on July 25, 2013, Plaintiff had lucid and intact thoughts and was oriented, although she was defensive and made minimal eye contact. *See* Pg. ID 605.  She noted that her sister visited almost daily to help her pay bills.  *Id*.  Plaintiff presented similar symptoms on August 12, 2013, but was upset because her sister was moving. *See* Pg. ID. 601.  During her appointment on September 12, 2013, Plaintiff reported feeling sad, lonely, and unsafe after her sister moved, but was still compliant with her medication. *See* Pg. ID 590.  On October 18, 2013 Plaintiff reported insomnia and physical pain, but also noted that she was going on vacation to Texas with relatives.  She was described as well groomed, calm, and coherent. *See* Pg. ID 587. On November 25, 2013 she reported that she was attending physical therapy, and that she was going to the water park with her mother and sister over the Thanksgiving weekend. *See* Pg. ID 584.

In early January, Plaintiff fell out of compliance with her medication, and appeared irritable, forgetful, anxious, and in pain. *See* Pg. ID 578-81. After attending a medication review with Dr. Magoon, she again presented as pleasant and cooperative, and specifically informed her therapist that "my medication is working for me." *See* Pg. ID 570-75.  However, by the time of her next documented appointment, on July 23, 2014, Plaintiff presented "crying, confused, paranoid thinking, unreasonable." *See* Pg. ID 569.  Plaintiff was no longer taking her medication and refusing to go to the hospital.  She was also repeatedly hallucinating "Diana," who told Plaintiff that she could do anything she wanted and did not have to take her medication.  In the treatment summary, the therapist specifically noted

> Therapist has seen client while on medication and she is a completely different person.  She is intelligent, reasonable, and kind.  However, while off medication she is unable to reason things out, has delusions of a friend named Diana or calls herself Diana who makes money by prostitution and has a carefree life. Therapist was informed later (after client left) at sign in desk she stated her name was Diana

> and seemed confused when she was told Diana was not on the appointment
> schedule, the name for this appointment time was [E]Lizabeth.

*See* Pg. ID 569.  Plaintiff returned for an appointment on July 28, 2014, at which time she reported that she was having medication difficulties, and often forgot to take the medication or did not want to take it because it made her sleepy. *See* Pg. ID 568. Plaintiff was instructed to continue taking her medication. *See* Pg. ID 567.

On September 30, 2014, Plaintiff submitted a medical source statements provided by Dr. Magoon on September 26, 2014.  *See* Pg. ID 653. In his statement, Dr. Magoon noted that Plaintiff suffered from "major depressive affective disorder" affecting her ability to interact appropriately with the public, supervisors, and co-workers. *See* Pg. ID 655. He listed her symptoms as "insomnia, racing thoughts, hears voices, does not remember who she is – confusing herself with another person. [P]aranoid thinking." *See* Pg. ID 654. He noted that she needed assistance with daily activities such as cooking, medications, and transportation, and concluded that she could not manage benefits in her own best interest. *See* Pg. ID 655-56.

## C.

On September 22, 2014, a hearing was held before Administrative Law Judge Andrew G. Sloss (the "ALJ").  When asked by the ALJ to describe her problems, Plaintiff testified that she experienced right shoulder, neck and back pain.  *See* Weaver Tr. 5, Pg. ID. 87.  According to Plaintiff, she had experienced the pain for seven to ten years, and that the pain had become worse with time.  *See* Weaver Tr. 5-6.  She also testified that it affected her ability to lift, reach overhead, and write. *Id*. at 5-6, 16. She claimed that injections to her shoulder had only made her pain worse. *Id*. at 16. Plaintiff also claimed to experience continuing pain on both feet from bunionectomy surgeries performed in June of 2010 and July of 2011. *Id*. at 6; *see also* Pg. ID

- 11 -

359-40.  Because of her various pains, Plaintiff testified that she struggled to crouch and crawl, and struggled to perform housework. *Id*. at 8.

Plaintiff also noted thyroid issues that affected her breathing, swallowing and eating. *Id*. at 15. The thyroid issues also caused her to experience constant thirst. *Id*. At the time of her hearing Plaintiff noted that she had a thyroidectomy scheduled for the following week.  Later medical reports note that Plaintiff did undergo the surgery. Progress reports from her follow-up appointments note that she was "healing well," that her reports of fullness and stiffness were "completely normal," that the remaining scar tissue would "break down over time," and that there was "[n]o need to worry."  Pg. ID 709.

At the September 22, 2014 hearing Plaintiff also testified about her depressive disorder. She testified that she experienced auditory hallucinations and struggled to get along with others. *Id*. at 8.  She often confused herself with an imaginary friend named Diana, who Plaintiff claimed to hallucinate when angry. *Id*. at 12.  Plaintiff testified that she was often grouchy, experienced daily crying spells, and regularly felt sad and hopeless.  *Id*. at 9.  She testified that she often felt fidgety and unsafe, experienced panic attacks when going out in public, and experienced headaches around once or twice a month. *Id*. at 10, 15.

Plaintiff repeatedly testified that her medications made her drowsy and forgetful. *Id*. at 5-7.  She testified that her medication caused her to fall asleep on and off up to three or four times throughout the day, and that she then struggled to sleep at night for more than 30 to 45 minute intervals. Weaver Tr. 13.  Her daughter no longer allowed her to drive after an incident in which Plaintiff fell asleep while driving. *Id*. at 14-15. Plaintiff further testified that she had been falling for no reason, and had recently sprained her knee as a result.  *Id*. at 7.  Subsequent to the hearing Plaintiff saw Doctor Gary Roome regarding the knee injury, who indicated that there was a

- 12 -

possibility that Plaintiff had torn a meniscus or significant cartilage as a result of the fall. Pg. ID 708.

Whether as a result of her depression or medication, Plaintiff testified that she was unable to cook because she was forgetful and regularly left the stove on. *Id*. at 8.  Her daughter therefore had to assist her in performing tasks that required use of electronics. *Id*. However, Plaintiff testified that she was able to use the microwave and prepare simple meals for herself. *Id*. at 14. Plaintiff testified that she spent most of her days at home waiting for her daughter to visit.  *Id*. at 9.

After hearing Plaintiff's testimony, the ALJ questioned a Vocational Expert regarding Plaintiff's work history and functional capacity. The ALJ first noted that Plaintiff's only relevant employment was her work as a medical assistant. *See* Pg. ID. 99.  The ALJ then posed the following hypothetical question:

> If [claimant] were limited to light work, except that she could only occasionally climb[] ramps or stairs and balance and her psychological symptoms would limit her to simple, routine tasks and work that has only occasional changes in the work setting and that involves only occasional interaction with the general public, co-workers and supervisors, would there be any jobs in the national economy that such a person could perform?

*Id*.  The Vocational Expert responded that such a person could perform light, unskilled work as an inspector (national numbers 180,000), a housekeeper (national numbers 50,000) or an assembler (national numbers of 125,000).  Pg. ID 99.

Noting that Plaintiff claimed to experience debilitating headaches twice a month, the ALJ then asked the Vocational Expert how many excused or unexcused absences employers generally allowed employees per month. Pg. ID 100. The Vocational Expert responded that employers allowed "no more than one per month and no more than a total of eight absences in a 12-month period of time." *Id*.  The Vocational Expert stated that because the Dictionary of Occupational

Tittles ("DOT") does not cover absenteeism, this testimony was not based upon the DOT, but upon his professional experience. *Id.* Plaintiff's Attorney then asked the Vocational Expert if the hypothetical individual could find work if she was going to be off task more than 15 to 20 percent of the day. *Id.* The Vocational Expert responded that there would be no competitive jobs for such an individual. *Id.*

## D.

In a decision issued on November 24, 2014 the ALJ denied Plaintiff's claim. *See* Decision, Pg. ID 63-78. While finding that Plaintiff had satisfied Step One, the ALJ rejected Plaintiff's claim that her asthma and hypothyroidism were severe impairments at Step Two. This was based on the ALJ's determination that the record did not contain any significant, objective medical findings that would support more than minimal limitations on Plaintiff's ability to perform work. The ALJ noted that Plaintiff's mild and intermittent asthma was adequately managed by medication, her lungs were often clear on physical inspection, and her chest imaging was often negative. The ALJ further noted that her hypothyroidism status-post thyroidectomy was managed by medication. Finally, the ALJ noted that the consultative examiner had determined that Plaintiff could lift, pull, push, carry, and grip, and did not demonstrate any shortness of breath, all in contradiction of her testimony. On the other hand, the ALJ found that Plaintiff's generalized anxiety disorder and major depressive disorder constituted severe impairments pursuant to 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Proceeding to Step Three, the ALJ did not find that any impairment or combination of impairments met or equaled a listed impairment under 20 C.F.R. Part 404 Subpart P. Specifically, the ALJ concluded that Plaintiff had not met her burden of demonstrating any condition or conditions that satisfied listings 3.03 (asthma), 12.04 (affective disorders), or 12.06

(anxiety related disorders).  This conclusion was based on findings that Plaintiff was only mildly restricted in activities of daily living, and experienced moderate difficulties in social functions, concentration, persistence and pace.  The ALJ also noted that Plaintiff had presented no evidence that she had experienced an episode of decompensation for an extended duration.

Before proceeding to Step Four the ALJ found that Plaintiff had the following residual capacity:

> The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can occasionally climb ramps or stairs and balance.  Her psychological symptoms limit her to simple, routine tasks, in work that has only occasional changes in the work setting, and that involves only occasional interaction with the public, co-workers, and supervisors.

*Id*.  This residual capacity finding was based on a finding that Plaintiff was not fully credible because her testimony was not supported by objective findings. According to the ALJ, in contrast to Plaintiff's testimony, the record showed that Plaintiff's mental impairments were managed by medication and therapy when Plaintiff was compliant. The ALJ accorded "great weight" to the consultative psychological findings of Doctor Matthew P. Dickson, Ph.D. and "great weight" to the consultative physical examination opinion from Doctor Michael Geoghegan, D.O.  The ALJ gave "little weight" to the medical statement completed by Plaintiff's treating psychologist, Doctor D. Magood, M.D, finding her opinion that Plaintiff's major depressive disorder markedly or extremely limited her ability interact with others to be inconsistent with the substantial record evidence.

At Step Four, the ALJ found that Plaintiff was unable to perform any of her past relevant work.  However, at Step Five the ALJ concluded that there were a significant number of jobs in the national economy that Plaintiff would be able to perform.  This conclusion was based in part upon the Vocational Expert's testimony at the administrative hearing. Because Plaintiff could

perform work as an inspector, a housekeeper, or an assembler, the ALJ determined that she was not disabled within the meaning of The Act.

After the Appeals Council denied Plaintiff's request for review, Plaintiff initiated the present action on March 16, 2016. *See* Compl. ECF No. 1. The appeal was referred to Magistrate Judge Patricia T. Morris for report and recommendation. *See* ECF No. 4. After the parties filed cross motions for summary judgment, the magistrate judge issued her report. *See* ECF Nos. 10-12.

## II.

Pursuant to Federal Rule of Civil Procedure 72, a party may object to and seek review of a Magistrate Judge's report and recommendation. See Fed. R. Civ. P. 72(b)(2). Objections must be stated with specificity. *Thomas v. Arn*, 474 U.S. 140, 151 (1985) (citation omitted). If objections are made, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). De novo review requires at least a review of the evidence before the Magistrate Judge; the Court may not act solely on the basis of a Magistrate Judge's report and recommendation. *See Hill v. Duriron Co.*, 656 F.2d 1208, 1215 (6th Cir. 1981). After reviewing the evidence, the Court is free to accept, reject, or modify the findings or recommendations of the Magistrate Judge. *See Lardie v. Birkett*, 221 F. Supp. 2d 806, 807 (E.D. Mich. 2002).

Only those objections that are specific are entitled to a de novo review under the statute. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). "The parties have the duty to pinpoint those portions of the magistrate's report that the district court must specially consider." *Id.* (internal quotation marks and citation omitted). A general objection, or one that merely restates the arguments previously presented, does not sufficiently identify alleged errors on the part of the

magistrate judge. *See VanDiver v. Martin*, 304 F.Supp.2d 934, 937 (E.D.Mich.2004). An "objection" that does nothing more than disagree with a magistrate judge's determination, "without explaining the source of the error," is not considered a valid objection. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Without specific objections, "[t]he functions of the district court are effectively duplicated as both the magistrate and the district court perform identical tasks. This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrate's Act." *Id.*

### III.

When reviewing a case under 42 U.S.C. § 405(g), the Court must affirm the Commissioner's conclusions "absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (citations omitted). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

Under the Social Security Act ("The Act"), a claimant is entitled to disability benefits if she can demonstrate that she is in fact disabled. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). Disability is defined by The Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.05. Plaintiff Weaver carries the burden of establishing that she meets this definition. 42 U.S.C. §§ 423(d)(5)(A); *see also Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 459 (6th Cir. 2012).

Corresponding federal regulations outline a five-step sequential process to determine whether an individual qualifies as disabled:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment. Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled. Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 719 (6th Cir. 2012) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)).  Through Step Four, Plaintiff bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work.  At Step Five, the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).

### A.

Plaintiff first objects that the magistrate judge erred in determining that the ALJ's assignment of great weight to the opinion of consultative examiner Dr. Geoghegan was consistent with the record.  Plaintiff argues that Dr. Geoghegan did not review the supplemental medical records in preparing his report, did not discuss Plaintiff's diagnosis of impingement syndrome in her right shoulder, did not discuss Plaintiff's previous complaints of pain in her back and neck, and did not acknowledge Plaintiff's previous bunionectomies.  Plaintiff also argues that Dr. Geoghegan's opinion only related to Plaintiff's asthma and hypothyroidism.

At the time Dr. Geoghegan performed his examination of Plaintiff, the extent of the medical evidence related to her claims of right shoulder and foot pain may be summarized as follows. During doctor's appointments on April 23, 2012 and May 5, 2012 Plaintiff reported right shoulder pain after allegedly dropping a chair on her right shoulder. Pg ID. 322.  However on May 16, 2012 Plaintiff reported to a Doctor that she had injured her right side on May 13, 2012 when she was "horsing around' with a friend. *See* Pg. ID 327. Plaintiff also inconsistently reported intense chronic foot pain. On May 31, 2012 Plaintiff reported that she was no longer in any pain. *See* Pg. ID 331. She again did not report any pain during an appointment on April 26, 2013. *See* Pg. ID 340.  During that appointment, Dr. Roome found that Plaintiff had "normal alignment and mobility" of her extremities. Pg. ID 342.

On July 17, 2013 Dr. Geoghegan performed a physical examination of Plaintiff that covered her extremities and musculoskeletal. While he did not specifically mention that she had scars on her feet, he noted that she "had no difficulty getting on and off the examination table, no difficulty heel and toe walking, no difficulty squatting, and no difficulty hopping." *See* Pg. ID 354. In examining Plaintiff's shoulders, tests of abduction, adduction, internal rotation, external rotation, and forward elevation came back normal. Pg. ID 355. Examination of her dorsuolumbar and cervical spine also revealed a normal range of motion.  Dr. Geoghegan did not review the supplemental medical records and did not discuss Plaintiff's diagnosis of impingement syndrome or her claims of shoulder pain because those medical records were not submitted by Plaintiff until over a year after Dr. Geoghegan prepared his opinion.

An ALJ does not err in relying on the opinion of a state medical consultant whose opinion was issued before the record was complete where the ALJ independently considered subsequent records. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513-14 (6th Cir. 2010).   In

- 19 -

the present case the ALJ specifically addressed Plaintiff's claimed foot, shoulder and arm pain, but did not find the claims credible based on the medical evidence and Plaintiff's own reports about her daily activity. *See* Pg. ID 73-74.

Plaintiff is correct that the ALJ did not address medical records related to Plaintiff's impingement syndrome diagnosis.   However, under the Act Plaintiff had the burden of establishing a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A).   Plaintiff did not meet her burden of establishing that any physical impairment related to her impingement was likely to last at least 12 months. After varying complaints of pain through late 2013 and early 2014, Plaintiff was diagnosed with impingement syndrome in July of 2014 and received a cortisone injection on July 30, 2014. Pg. ID 633. At that time P.A. Wines documented that Plaintiff's symptoms had previously improved with physical therapy and a cortisone injection, but that the symptoms had returned over the last several months. Pg. ID 633.   Following the injection, "[a]fter ten minutes of observation the patient noticed that the majority of [her] pain and symptoms were relieved." *See* Pg. ID 634. With the exception of her own, discredited testimony, Plaintiff did not provide any evidence that any physical impairment related to her impingement syndrome was ongoing.   The ALJ therefore did not err by failing to address Plaintiff's impingement syndrome diagnosis. *See Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 839 (6th Cir. 2005).

For these reasons, the magistrate judge did not err in finding that the ALJ's assigning of great weight to the opinion of Dr. Geoghegan was consistent with the record.

**B.**

Plaintiff next objects that the ALJ erred in failing to include any functional limitations in relation to Plaintiff's physical or exertional impairments. In support of this argument Plaintiff again points to her neck, back, shoulder and foot pain, as well as to her ongoing asthma.  In his opinion the ALJ found that Plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can occasionally climb ramps or stairs and balance." The magistrate Judge found that this finding was based on substantial evidence, and addressed Plaintiff's argument at length in her report and recommendation. *See* Rep. & Rec. 17-19.   Because Plaintiff did not meet her burden of demonstrating medically determinable physical impairment caused by her alleged arm, shoulder, back and foot pain, *see* 42 U.S.C. § 423(d)(1)(A), and because the evidence suggested that Plaintiff's asthma was mild and adequately managed with medication, the ALJ's RFC finding is based on substantial evidence. Plaintiff's second objection will be overruled.

## C.

In her third objection Plaintiff again disputes that the ALJ's RFC finding was based on substantial evidence, arguing that the ALJ did not properly account for Plaintiff's moderate deficiencies in concentration, persistence, or pace. The ALJ noted that Plaintiff had "moderate difficulties" with regard to concentration, persistence, or pace. *See* Pg. ID 70.   However, he clarified that Plaintiff had the ability to sustain attention sufficiently to drive a car, watch television, use a computer, and complete a crossword puzzle. *Id*.   The ALJ then determined that Plaintiff was limited to "simple, routine tasks, in work that has only occasional changes in the work setting, and that involves only occasional interaction with the public, co-workers, and supervisors." *See* Pg. ID 71.  In making this determination, the ALJ gave "great weight" to the

consultative findings of Dr. Dickson and "little weight" to the medical source statement completed by Dr. Magoon. *See* Pg. ID 75.

Aside from misstating the magistrate judge's report, Plaintiff's objection is also without merit.   Plaintiff correctly points out that limitations to simple work "*might* be insufficient to account for moderate deficiencies in concentration, persistence, or pace", *see Gordon v. Comm'r of Soc. Sec.,* 2015 WL 5335477 *5 (E.D. Mich. 2015) (emphasis added), particularly where the ALJ gives substantial weight to evidence that the claimant is impaired in her ability to pay attention even while performing simple tasks. *See Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 516 (6th Cir. 2010).  However, the ALJ in this case made no finding that Plaintiff's deficiencies in concentration, persistence, or pace would affect her ability to perform even simple tasks. Instead, the ALJ specifically noted that Plaintiff retained the ability to perform simple tasks such as driving, watching television, using the computer, and doing crossword puzzles. His RFC determination is therefore consistent with his findings and based on substantial evidence.

### D.

Plaintiff next objects that the ALJ's unsupported reliance on state agency medical and psychological consultants is grounds for remand.  As explained by the magistrate judge, the state agency medical consultants' opinions were consistent with the record as a whole, and the ALJ properly considered evidence submitted after the consultants completed their review. The ALJ's incorrect assertion that the consultants had the opportunity to view the entire record was therefore harmless error.  Because the opinions were based on substantial evidence, the ALJ did not err in giving them weight.

### E.

In her fifth objection, Plaintiff argues that the magistrate judge incorrectly found that the ALJ did not err in assigning little weight to Plaintiff's treating psychiatrist, Dr. Magoon.   In support of this argument, Plaintiff emphasizes her hallucinations and the troubles that she reported during appointments on January 24, July 24, and July 28, 2014.  *See* Pg. ID 568-578. Importantly, in each of those instances Plaintiff had been non-compliant with her medication.  *Id*. The ALJ specifically found that Plaintiff's treatment, "which includes psychiatric medications and therapy, has been relatively effective in controlling her symptoms."  *See* Pg. ID 74. The ALJ further found that Dr. Magoon's medical source statement was not consistent with the substantial evidence and that he based his findings on Plaintiff's subjective complaints.  *See* Pg. ID 75-76; *see also Crum v. Sullivan,* 921 F.2d 642, 645 (6th Cir. 1990).  Because the ALJ gave good reason for giving little weight to the opinion of Dr. Magoon, Plaintiff's fifth objection will be overruled.

**F.**

Plaintiff next objects that the magistrate judge erred in finding that the ALJ's opinion provides a logical bridge between the record evidence and the RFC. This objection is impermissibly general. *See Mira,* 806 F.2d at 637 (6th Cir. 1986).   It is also without merit because the ALJ sufficiently addressed the record evidence and based his RFC finding on substantial evidence.

**G.**

In her final objection, Plaintiff broadly objects to the Magistrate judge's conclusion that the case be affirmed. An "objection" that merely disagrees with a magistrate judge's determination is not a valid objection. *Howard*, 932 F.2d at 509.  For this reason, and for the reasons set forth above, Plaintiff's final objection will be overruled.

**IV.**

Because the ALJ reached his decision using correct legal standards and because those findings were supported by substantial evidence, the Court must affirm it, even if reasonable minds could disagree on whether the individual was disabled or substantial evidence could also support a contrary result. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *see also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2006) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.").

Accordingly, it is **ORDERED** that Plaintiff Weaver's objections, ECF No. 13, are **OVERRULED**.

It is further **ORDERED** that the report and recommendation, ECF No. 12, is **ADOPTED.**

It is further **ORDERED** that Plaintiff Weaver's motion for summary judgment, ECF No. 10, is **DENIED**.

It is further **ORDERED** that Defendant Commissioner's motion for summary judgment, ECF No. 11, is **GRANTED**.

It is further **ORDERED** that the Commissioner of Social Security's decision is **AFFIRMED**.


                                        s/Thomas L. Ludington
                                        THOMAS L. LUDINGTON
                                        United States District Judge

Dated: March 21, 2017

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 21, 2017.

s/Kelly Winslow for
MICHAEL A. SIAN, Case Manager